## IN THE UNITED STATES DISTRICT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| ROBERT BARTON, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:19-CV0434-KOB |
| ANDREW SAUL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Robert Barton, the claimant, filed an application for supplemental security income under Title XVI on March 9, 2016. (R. 25, 62, 170). He alleged disability beginning on August 3, 2013 because of high blood pressure, gout, diabetes, blood clots in his legs, acid reflux, and high cholesterol. (R. 25, 62, 170, 47). The Social Security Administration denied the claimant's application on April 27, 2016, and the claimant had a video hearing before an Administrative Law Judge on April 25, 2018. (R. 25, 76, 81).

In a decision dated June 12, 2018, the ALJ found the claimant was not disabled, and, therefore, not entitled to benefits. (R. 70). The claimant appealed to the Appeals Council. (R. 7-8). After the Appeals Council denied the claimant's request for review, the ALJ's decision became the final decision of the Commissioner of Social Security. (R. 1-3). The claimant has exhausted his administrative remedies. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), this court has jurisdiction to decide this case. This court AFFIRMS the Commissioner's decision for the reasons stated below.

## II. ISSUE PRESENTED

The claimant presents the following two issues for review:

(1)  whether substantial evidence supports the ALJ's conclusion that the claimant has a Residual Functional Capacity (RFC) to perform light exertional work; and

(2)  whether the evidence supports the ALJ's determination that the claimant is not disabled under the Medical Vocational Guidelines 201.12.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence,

or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

*Residual Functional Capacity*

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

    (1) Is the person presently employed?
    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
    (4) Is the person unable to perform his or her former occupation?
    (5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of not disabled. *McDaniel v. Bowen*, 800 F.2d 1026, 1030

(11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920. At the third step, the ALJ must determine the claimant's RFC, which is a measurement to guide the ALJ in deciding if the claimant is capable of doing past work, or any other work in the economy. 20 C.F.R. § 404.1520(a)(4); SSR 96-8p.

A claimant's RFC "is not the *least* an individual can do despite his or her limitations or restrictions, but the *most."* SSR 96-8p(5). A claimant must be able to perform "at least substantially all of the activities of work at a particular level" for an ALJ to determine that the claimant has an RFC of that particular level. SSR 83-10. A claimant who can perform work at his or her determined RFC can also perform at a lower RFC; for example, if a claimant has an RFC for light work, that claimant can also perform sedentary work, "unless there are additional limiting factors." 20 C.F.R. § 404.1567(b).

The ALJ's determination of a claimant's RFC must be "based on all relevant medical and other evidence, of a claimant's remaining ability despite his impairment." *Castle v. Colvin*, 557 F. App'x 849, 852 (11th Cir. 2014). The ALJ must also consider the descriptions and observations made by a claimant about his or her own limitations resulting from severe impairments. 20 C.F.R. § 404.1545(a)(3). To support his findings with substantial evidence, an ALJ must "link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work." *Packer v. Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013), aff'd, 542 F. App'x 890 (11th Cir. 2013).

To avoid being conclusory, an ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. A decision is not supported by substantial evidence if the ALJ "reached the result that [he] did by focusing upon one aspect of the evidence and ignoring other parts of the record." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). While the ALJ is not required to specifically refer to every piece of evidence in the record, his decision cannot be a broad rejection. *Packer v. Comm'r, SSA*, 542 F. App'x 890, 891-92 (11th Cir. 2013)) (citing to *Dyer*, 395 F.3d at 1211).

*Medical Vocational Guidelines*

At step five, an ALJ has two methods by which he may determine a claimant's ability to "adjust to other work in the economy": (1) applying the grids or (2) considering the testimony of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004). An ALJ should not rely exclusively on the grids in two instances: (1) when the claimant is unable to perform a full range of work at a given exertional level, and (2) when a claimant has non-exertional impairments that significantly limit basic work skills. 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a); *Smith v. Bowen*, 792 F.2d 1547, 1554 (11th Cir. 1987) (explaining that the grids should only be used when each grid variable "accurately describes the claimant's situation"). Exertional impairments are concerned with the physical strength of a claimant, while non-exertional impairments are issues unrelated to physical strength such as "certain mental, sensory, or skin impairments." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e). Pain is a non-exertional impairment. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996).

Each grid covers a physical exertional level, and within each grid, the ALJ can find a decision of disabled or not disabled based on age, education, and work experience. 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). "Nothing in the relevant statutes or regulations requires the

ALJ to use the grids as a framework in all instances." *Watson v. Astrue*, 376 F. App'x 953, 958 (11th Cir. 2010). "[T]he preferred method of demonstrating job availability when the grids are not controlling is through vocational expert testimony," but the ALJ can still use the grids as a framework to guide his decision. *See Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1999); *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).

## V. FACTS

On June 12, 2018, the day the ALJ delivered his decision, the claimant was fifty-two years old. He completed the 12th grade. The claimant last worked in 2013 as an engine inspector; previously worked as a cloth inspector; and claimed he could no longer work because of his back pain, gout, and the swelling in his feet and legs. The claimant completed a Disability Report as part of his application in which he described his work history for the prior fifteen years. For his last job, the claimant listed work as an inspector for a manufacturing business in 2007 for twelve hour days, three days a week. Also in 2007, the claimant stated he did general labor for an assembly company for one month, working eight hour days, five days a week. (R. 27-28, 201).

*Physical Impairments*

The claimant, complaining of swelling and pain in his left leg, saw Dr. Don Abernathy at the Abbeville Area Medical Center on September 23, 2009. The claimant said his pain was a seven to eight on a ten-point scale, but then rated it as a nine after the triage nurse applied a knee immobilizer. He stated he had injured his left leg in a car accident three years ago and had a blood clot.

An x-ray of his left knee showed smooth articular surfaces, normal medial and lateral compartment joint space and patellofemoral joint space, and no joint effusion. Dr. Abernathy diagnosed the claimant with a baker's cyst and leg pain, and noted a history of reflux. Dr.

Abernathy gave the claimant 10 milligrams of Lortab for pain, then prescribed Medrol and Vicodin for inflammation. At the time of this appointment, the claimant was taking Celebrex for pain and swelling, Lasix for swelling, Ranitidine for reflux, Metformin for diabetes, and Metoprolol tartrate, Clonidine, Lisinopril, and Norvasc for high blood pressure. (R. 294-300).

On October 26, 2009, the claimant saw Dr. Steve Carawan at the Carolina Bone and Joint Clinic, PA as a new patient complaining of "pain that shoots from his knee to his buttocks area" and swelling in his knee. Dr. Carawan stated that the claimant "ha[d] been disabled" since an auto accident in 2006. Dr. Carawan noted pain, swelling, and mild degenerative arthritis in the claimant's left knee. He diagnosed the claimant with pitting edema in his left leg caused by excess fluid in the body that leaves temporary indentation when pressure is applied. He also noted that the claimant likely had a baker's cyst. The claimant felt pain when Dr. Carawan conducted a straight leg raise and reported stiffness when he first got out of bed in the morning, difficulty climbing stairs, and a sense of instability, although he did not report any episodes of his knees buckling. Dr. Carawan administered an injection of Lidocaine and Medrol on the claimant's left knee. (R. 242-43).

The claimant saw Dr. Jonathan Hegler at the Abbeville Area Medical Center on November 5, 2009, complaining of knee pain and a knee strain. The claimant reported his pain level as a five out of ten, but denied any swelling. Dr. Hegler suspected the claimant had a ligament tear and ordered an MRI of the claimant's left knee. He said the claimant was "quite mobile," and noted he was diabetic and had hypertension. As part of the claimant's illness history, Dr. Hegler noted that several weeks ago the claimant had a car accident in which his car was struck on the side by a railroad truck.

Upon examining the claimant, Dr. Hegler found he had a normal gait and full range of motion in his neck. An x-ray of the claimant's left knee from October 1, 2009 was normal. Dr. Hegler stated that the claimant's medical history suggests noncompliance with his blood pressure and blood sugar medications. Dr. Hegler administered 60 milligrams of Toradol in the claimant's right gluteal to treat his pain and refilled his prescription for Norvasc. He also stopped the claimant's prescription for Celebrex, prescribed Relafen and Vicodin for his pain, and prescribed Clonidine for the claimant's high blood pressure. (R. 278-88).

On November 19, 2009, the claimant visited Dr. James McQuown to get established as a patient at Calhoun Falls Family Practice. He said he had an old back injury for which he had surgery done twice and a history of deep vein thrombosis in his left leg because of a car accident. He also said he stopped taking coumadin after two years of treatment. He had normal neck motion and no swelling at this visit. The claimant also stated he had good control of his diabetes and some difficulty controlling his hypertension. He visited Dr. McQuown again on December 15, 2009 because he was having stomach cramps and blood in his stool. Dr. McQuown again noted that the claimant had normal range of motion in his neck and no swelling. He prescribed a new medication for the claimant's hypertension: chlorthalidone. At another visit with Dr. McQuown on January 19, 2010, the claimant said he felt his hypertension was stable. Dr. McQuown did not see any swelling in the claimant's extremities. (R. 324, 327-29).

Dr. McQuown referred the claimant to Dr. Christopher Ceraldi for a colonoscopy because the patient had blood in his stool for several months. The claimant first saw Dr. Ceraldi on January 20, 2010 at Abbeville Surgical. Dr. Ceraldi described him as "robust and healthy in appearance" and did not report any swelling. Dr. Ceraldi recommended the claimant have a colonoscopy done because of his age, family history of colon cancer, and the blood in his stool.

The claimant saw Dr. Ceraldi on February 2, 2010 at Abbeville Area Medical Center for a colonoscopy that revealed mild diverticulosis with moderate internal hemorrhoids. (R. 408, 319-20).

The claimant saw Dr. Locke Simons at Calhoun Falls Family Practice on March 18, 2010, complaining of a gout flare up in his right elbow. Dr. Simons noted swelling in the right elbow joint. The claimant also had bilateral swelling in his legs. Dr. Simons reported that the claimant's diabetes had worsened, noting the claimant was "not watching his diet as he should be." He increased the claimant's metformin dosage to treat the diabetes. The claimant's hypertension was stable. (R. 331).

The claimant saw Dr. Simons again on May 25, 2010 for gout, this time in his right hand. The claimant said the gout attacks were becoming more regular over time. Dr. Simons found tenderness and swelling in the claimant's right hand, wrist, forearm, and elbow joint. Dr. Simons prescribed prednisone for inflammation, Lortab for pain, and allopurinol for gout. (R. 333).

On June 25, 2010, Dr. McQuown saw the claimant at Calhoun Falls Family Practice for a follow-up visit. The claimant said he felt his diabetes and hypertension were stable, but he had some gout attacks. Dr. McQuown did not note any swelling. He increased the claimant's dose of Norvasc and stopped the claimant's Chlorthalidone prescription, both used to treat high blood pressure. The claimant saw Dr. McQuown on September 27, 2010, and again reported his diabetes and hypertension were stable. The claimant denied that he suffered pain or motion limitation from gout, denied swelling in his feet, and reported that he had some swelling at times without specifying where. Upon examination, Dr. McQuown noted slight swelling in the claimant's lower extremities. Dr. McQuown described the patient's activity and energy level as normal. (R. 334-36).

On November 4, 2010, the claimant saw Dr. McQuown because of a possible gout flare up in his left elbow. He said his gout attacks had become more frequent and complained of limited motion, pain, and swelling in his left elbow. Dr. McQuown reported swelling in the claimant's left elbow that resulted in redness and limited movement. Dr. McQuown also instructed the claimant to watch his diet, administered Decadron by injection for inflammation, and prescribed him Lortab for pain and Colchicine for gout. The claimant then saw Dr. Ashley Wiggins on December 27, 2010 for a follow-up visit. He reported a recent gout flare up, which he described as "a whole lot better," though he complained of residual soreness in his left arm, hand, and elbow. The claimant had no complaints of feeling fatigued. Dr. Wiggins found that the claimant's gait was normal, but his left elbow was swollen. (R. 338-340).

The claimant saw Dr. McQuown again on March 28, 2011 for a follow-up visit. He reported no further gout flare ups since his last visit. The claimant's diabetes and hypertension were stable. Dr. McQuown found no pain, motion limitations, or swelling. He reported the claimant's gait as normal. He also reviewed the claimant's medications, increased his daily dose of lisinopril, and noted that the claimant was off Diovan, both used to treat high blood pressure.

The claimant saw Dr. McQuown on October 26, 2011 for another follow-up visit. He reported an ache in his right shoulder, and Dr. McQuown noted slight stiffness in his right shoulder. Dr. McQuown examined the claimant's neck and found it normal. He had no swelling. At that visit, he claimant's diabetes was stable, but his hypertension was poor because he had run out of his medications. Dr. McQuown administered an injection of Dexamethasone Sodium Phosphate to the claimant to help treat his gout. On November 3, 2011, the claimant visited Dr. McQuown for a follow-up, complaining of pain in his hands. Dr. McQuown described the claimant's hypertension as "benign." (R. 341-46).

When the claimant next visited Dr. McQuown on February 20, 2012 for a routine follow-up for his gout, his diabetes and hypertension were stable and he had no swelling. Dr. McQuown described the claimant's feet as "normal and non-tender" and told the claimant to work on better diet control. The claimant saw Dr. McQuown on May 4, 2012 for a routine clinic follow-up of acute cystitis. He complained of pain in his left flank and above his pubic bone. The claimant had no swelling. Dr. McQuown determined that the claimant had a urinary tract infection and prescribed the claimant Ciprofloxacin for treatment. The claimant had an appointment on May 21, 2012 with Dr. McQuown to discuss the claimant's recent lab results. Dr. McQuown increased the claimant's allopurinol prescription to treat his gout and started the claimant on Pravachol to treat high cholesterol. Between then and the claimant's follow-up with Dr. McQuown on August 3, 2012, he reported one gout attack. The claimant again said his hypertension and diabetes were stable. He had no swelling in his extremities. (R. 355, 348-59).

On a December 4, 2012 visit, the claimant saw Dr. McQuown because he had a cough, chills, and headache. The claimant was 280 pounds, ten pounds lighter than he had been on the previous August visit. The claimant visited Dr. McQuown again on April 22, 2013 for a follow-up visit, and his weight was back up to 290 pounds. The claimant reported that his gout was "much better" and he only had occasional attacks. The claimant's diabetes was stable and he had no swelling in his extremities or abdominal pain. (R. 360-65).

Dr. Simons saw the claimant for an ear infection on June 14, 2013 at Calhoun Falls Family Practice. Dr. Simons also noted a mild gout flare up in the claimant's right thumb joint causing redness, swelling, and tenderness. Dr. Simons saw no swelling in the claimant's extremities. The claimant had gained weight, weighing 298 pounds.

The claimant did not see Dr. Simons again until December 3, 2013 when he complained of increased back pain. The claimant said the pain had been mostly bearable, but most recently his back would hurt even when he was sitting. The claimant had swelling in his ankles and shins. His muscular strength was normal. He had a positive straight leg test. Dr. Simons found tenderness in the claimant's lumbar spine at level 3-5, as well as bilateral muscle spasms. Dr. Simons prescribed the claimant hydrocodone-Acetaminophen for pain and cyclobenzaprine for muscle spasms. (R. 367-72).

On February 14, 2014, the claimant visited Dr. Simons for a follow-up visit. He reported that his pain with medications averaged a five to six on a ten-point scale. The claimant had swelling in his shins. He told Dr. Simons he would like more pain relief, though he was getting some relief from the muscle relaxer and the Norco. Dr. Simons increased his Norco prescription to help with the pain and told the claimant he could "play with his dose" of Flexeril to balance pain relief and sedation. Dr. Simons also told the claimant to lose weight and walk for exercise. (R. 374-76).

The claimant visited Billie White, R.N., N.P., on May 29, 2014 at Calhoun Falls Family Practice because of lower back pain. The claimant said the prior increase in his pain medications and muscle relaxers "worked very well" to help control his back pain. NP White noted that the claimant had swelling in his ankles and shins. She recommended diet and exercise.

On October 6, 2014, the claimant visited NP White again for a follow-up visit complaining of burning and numbness on the bottom of his feet. Other than increased burning in his feet, the claimant reported that he was "doing pretty well." He said he "has not been eating well lately," "has been eating more sweets and rice," checks his blood sugar sporadically, and has poor glycemic control, but his diabetes was stable. He had no swelling in his extremities and

his feet were normal upon examination. The claimant told NP White that he would rather work on his diet and exercise habits than take more medication for weight loss, blood pressure, and blood sugar. (R. 377-82).

NP White reported on a January 13, 2015 follow-up appointment that the claimant was "not adherent with the medical regimen" and she did not think the claimant was taking his medications as he should. The claimant continued to report back pain, but he had been out of medication for two to three weeks. The claimant stated that his back pain makes it hard to exercise and admitted to controlling his diabetes poorly. The claimant had no swelling in his extremities. NP White prescribed the claimant tramadol for his back pain.

On February 16, 2015, the claimant visited Dr. Simons at Calhoun Falls Family Practice for a follow-up. He had swelling in his ankles and shins. Dr. Simons prescribed glimepiride for his diabetes. (R. 383-88).

On May 6, 2015, Dr. Ceraldi performed another colonoscopy on the claimant at the Abbeville Area Medical Center for screening because he had a family history of colon cancer. Dr. Ceraldi removed two polyps, once again found mild diverticulosis, and biopsied the claimant's ileocecal valve fold because of some irregularity, but reported no other issues. The claimant then saw Dr. Simons on May 18, 2015 at Calhoun Falls Family Practice for a follow-up, reporting that he felt well and had no side effects from his medications. The claimant said the pain in his neck and back seemed to be getting worse, and he still had swelling in his feet, ankles, and shins. (R. 265, 316, 389-90).

The claimant saw Chelsea Riddle, PA-C, on August 24, 2015 at Calhoun Falls Family Practice for a follow-up visit. He complained of low back pain and a grinding pain in his left shoulder when raising his arm. The claimant said he had shoulder pain for the past four to five

months. PA Riddle found the claimant's left shoulder was normal with no tenderness, but said he needed an x-ray. The claimant saw PA Riddle again on December 7, 2015 for a follow-up visit. He said he was trying to lose weight by working on his diet and exercise habits, staying very active with his grandchildren, and feeling fairly well. He did not get his shoulder x-rayed. He had swelling in his shins and ankles. PA Riddle advised him to get twenty to thirty minutes of daily activity. The claimant saw PA Riddle on December 14, 2015 for a recheck of his hypertension and lab results. He weighed 276 pounds. He still had swelling in his shins and ankles, and she advised him again to get twenty to thirty minutes of daily activity. (R. 392-402).

On January 20, 2016, the claimant saw Dr. Ceraldi at the Abbeville Area Medical Center for another colonoscopy to ensure there were no new major polyps and "the prior findings were either stable or had resolved." Dr. Ceraldi noted right sided diverticulosis and scattered left side diverticulosis with no other issues. The claimant then saw Chelsea Riddle Castellone PA-C, on March 21, 2016 for a follow-up visit. The claimant said he had been working on his diet, exercising, and taking his medications as directed. He weighed 273 pounds at the visit. He reported no recent gout flare ups and his hypertension was stable. He had swelling in his ankles and shins. Castellone noted the claimant's feet were normal with tactile sensation. (R. 261, 314, 499, 404, 480-82).

The claimant completed a Function Report on March 28, 2016, detailing his daily activities and limitations. When asked to describe his typical day, the claimant said he will brush his teeth, wash his face, eat, watch tv, do chores around the house, and take his medications. He stated that he makes his own meals, though it takes longer than it used to because sometimes he cannot stay on his feet long. He also stated that he can do most household chores, though again, it takes longer because of his back pain and swelling. The claimant said he cannot bend to tie his

shoes well or sit in a tub because of his back pain, and he cannot sleep on his back because his neck will hurt and his shoulders will get sore. (R. 209-11).

The claimant stated that he shops for clothes and food, but cannot get around like he used to. The claimant listed basketball as a hobby, but said he cannot play any more because of his back pain and swelling. He also stated that he watches a lot of tv, but cannot sit for too long. For social activities, the claimant stated he goes to church and some sporting events, but again noted he cannot sit for long. Concerning his physical limitations, the claimant stated that he cannot lift much or bend because of his back pain. He also stated that he cannot stand for long periods of time or squat, and reaching causes him pain in his shoulder, back, and legs. Finally, the claimant said that he cannot walk for long periods of time and struggles to finish things he starts because of the pain in his back and legs. (R. 212-14).

At the request of the Social Security Administration, Dr. Ammar Aldaher saw the claimant on April 21, 2016 at Craddock Health Center for a consultative examination. The claimant chiefly complained of pain in his back with no radiation of the pain to his lower extremities. He weighed 276 pounds at this visit and had no swelling in his extremities. Dr. Aldaher reported that the claimant had normal range of motion in his neck and no spasms or abnormality in the range of motion in his back. The claimant also had a normal gait, negative seated leg raise, and no muscle weakness. Finally, Dr. Aldaher noted that the claimant could sit, stand, walk, and lift, carry, and handle objects. (R. 462-64).

The claimant saw PA Castellone on June 30, 2016 for a follow-up visit at Calhoun Falls Family Practice. He said he had been "feeling fairly well" since his last visit in March. He reported occasional sharp pain in his feet, but said it did not occur daily and he did not want to start a new prescription. He said his back pain was stable. PA Castellone noted that the

claimant's diabetes and hypertension were also stable. The claimant said he was not exercising, and he weighed 281 pounds. He had swelling in his ankles and shins. PA Castellone told the claimant to get at least thirty minutes of exercise daily and suggested walking as an option. (R. 476-79).

On September 12, 2016, the claimant saw Dr. Stacy Towles-Moore at Quality of Life for an office visit about his hypertension and diabetes. He complained of swelling in his feet and legs. The claimant rated his pain as a four out of ten. Dr. Towles-Moore examined the claimant and said he had moderately reduced range of motion and muscle spasm in his lumbar spine and swelling in his feet, ankles, and lower legs. He weighed 275 pounds. Dr. Towles-Moore told the claimant to walk at least ten minutes a day. (R. 502-09).

At another visit to Dr. Towles-Moore on January 19, 2017 the claimant reported he was "up on his feet a lot of the day." He rated his pain as a three out of ten. He had swelling in his ankles and shins. The claimant had gained weight, weighing 286 pounds. He stated his diabetic medications and diet were "working." His hypertension was stable and his blood pressure was doing much better. Dr. Towles-Moore instructed the claimant to walk fifteen minutes a day, three to four days a week. She told him to keep propping his feet up at night and increased his water pill dosage. (R. 510-16).

The claimant visited Quality of Life again on April 20, 2017, and saw Ashleigh Sullivan, CRNP. His diabetes and hypertension were stable. The claimant reported pain in his neck and back, and rated the pain as a one out of ten. He weighed 282 pounds. He noted mild neuropathy in his feet that occurred intermittently. He said standing and movement aggravated his neuropathy and rest relieved it. NP Sullivan noted tenderness in the claimant's lumbar spine with moderate pain caused by motion and muscle spasms in the claimant's cervical spine with mild

pain with motion. NP Sullivan found the claimant's gait was normal and he had no weakness or loss of sensation in his feet. She told the claimant to exercise at least thirty minutes a day. (R. 517-25).

On July 28, 2017, the claimant saw Dr. Towles-Moore and complained of sharp abdominal pain that had gone on for one month. He rated his pain as a four out of ten. Dr. Towles-Moore described his hypertension as moderate-severe, but noted it was stable. She also noted that his diabetes was stable. The claimant weighed 277 pounds. She told the claimant to walk daily for twenty minutes. (R. 526-33).

On a November 10, 2017 visit to Dr. Towles-Moore, the claimant said he had been experiencing moderate-severe back pain for one month that was worsening. He said bending, rolling over in bed, standing, twisting, and walking aggravated his back pain. He rated his pain as a four out of ten. He had mild abdominal tenderness, muscle spasms in his lumbar spine with a moderately reduced range of motion, and moderate pain in his ankles with motion. He continued to do well with his diabetes, but had a new onset of burning in his left foot. He weighed 274 pounds. Dr. Towles-Moore told him to walk for ten to twenty minutes every day. (R 534-42).

The claimant saw Dr. Towles-Moore on March 2, 2018 . He was feeling well and sticking to his diet. He rated his pain as a four out of ten, and described his back pain as occasional and stable. His diabetes was stable. Dr. Towles-Moore noted that the claimant has neuropathy and muscles spasms in his lumbar spine with moderate pain caused by motion. He weighed 272 pounds at this visit, and she instructed him to exercise three times a week for twenty to thirty minutes. (R. 543-52).

*The ALJ Hearing*

The ALJ held a video hearing on April 25, 2018. The claimant testified that he worked as an engine inspector in 2013. (R. 27). Prior to that, the claimant worked as a cloth inspector from 2004 to 2006. (R. 28). As a cloth inspector, the claimant spent most of the day standing and would sometimes have to pick up objects weighing more than 50 pounds. (R. 29-30).

The claimant said the main reason he is not able to work is his history of two back operations, diabetes, high blood pressure, gout, stomach problems, acid reflux, and some arthritis in his hands. (R. 30). He said he was currently taking Metformin and another medication for his diabetes; Neurontin for his neuropathy; Allopurinol for his gout; HCTZ for the swelling in his feet; Metoprolol, Toprol, and Lisinopril for his blood pressure; Ranitidine for his acid reflux; and Flexeril for his back pain. (R. 30-31). The claimant said he took his medications as prescribed (R. 32). He also stated that he was on the medication program at Quality of Life, through which he received three of his medications for free and a discount on the others. (R. 32).

The claimant said he watches his three-year-old grandchild seven days a week, every other week. (R. 32). He also said he does not have a driver's license because it was revoked after the claimant failed to pay child support. (R. 32). The claimant confirmed that he does household chores while his wife works, but he has to take breaks to prop up his feet when sweeping. (R. 32-33, 35). The claimant stated he does not do any yard work because his neighbor takes care of it. (R. 33). He used to walk a mile a day around a track, but said he was "way out of shape now," and believed he could only walk a quarter or half of a mile. (R. 33).

The claimant stated he tries to assist his wife with shopping, but some days his back prevents him from doing so. (R. 38). He said if his back is hurting, he will find a place to sit while she shops. (R. 38-39). He said he can sometimes carry groceries, but not if he has been on

18

his feet that day. (R. 39). He said sometimes he is unable to put his socks and shoes on after he has been on his feet because of the swelling. (R. 40).

The claimant said he goes to ball games and must alternate between sitting and standing to alleviate the pain in his feet and back. (R. 34). When asked how long he could stand in a ten-foot work area where he had room to walk as needed, he said it would not be long before he had to sit because of  his back pain and the swelling in his feet and ankles. (R. 36). The claimant said he would not be able to stand and/or walk for two hours of an eight hour work day. (R. 40-41). He said he tried to return to work after his car accident, but after working a full day, he would have to leave early the next day because of the swelling in his feet and would not be able to go in the following day because of the swelling. (R. 41).

The claimant stated multiple times that the extent of the swelling in his legs, ankles, and feet depends on how much standing he did the day prior. (R. 36, 38, 40). The claimant said he also has trouble sitting for long periods of time because of his back pain, and he cannot sit up straight. (R. 36). He said his back hurts if he sits back too far or turns his neck around and he cannot sleep on his back. (R. 36-37). The claimant believed his last back surgery had been in 2006. (R. 34).

He said he had swelling every day, and said the swelling causes his feet to ache like a toothache. (R. 34, 39). To treat the swelling in his feet, the claimant said he uses cold compacts and takes aspirin, but aspirin "messes with" his acid reflux, so he cannot use it regularly. (R. 37). He also said he soaks his feet in hot water with Epsom salt and green rubbing alcohol. (R. 37). He said, if he is home, he elevates his feet to help the swelling go down and most of the swelling goes down at night. (R. 38).

The claimant also noted that he is left-handed, but has difficulty using that hand because he broke the fibula in his left arm. (R. 41). He said he cannot really lift his left shoulder because of the old fibula injury, and when he reaches out with his left arm, he feels pain in his neck and back. (R. 43). He also said he had blood clots in his legs and described the neuropathy in his feet as an "irritating needle type of pain." (R. 36, 40).

The vocational expert, Mr. Mosley, testified concerning work the claimant could perform in the current economy. (R. 43-45). He categorized the claimant's past work as a cloth inspector as light in exertion, but noted that the claimant likely performed the work at the medium level of exertion. (R. 43).

The ALJ presented Mr. Mosley with a hypothetical in which a worker with the same age, education, and past work as the claimant was limited to light, unskilled work. (R. 43-44). Further, the ALJ stated that the hypothetical worker's limitations would include "no climbing of ropes, ladders, or scaffolds; no work at unprotected heights with hazardous machinery; no more than occasional stooping, crouching, crawling, or kneeling and no more than frequent climbing of ramps or stairs." (R. 43-44). Mr. Mosley stated that the hypothetical worker could not perform the claimant's past work. (R. 44). He listed three potential jobs the hypothetical worker could perform: (1) a cashier, (2) a sales attendant, and (3) a cleaner or housekeeper. (R. 44). Mr. Mosley stated that approximately 800,000, 200,000, and 135,000 positions are in the national economy for the above jobs, respectively. (R. 44).

The ALJ then presented Mr. Mosley with a second hypothetical where the worker had the same limitations as set in the previous hypothetical, but was limited to sedentary work. (R. 44).

Mr. Mosley said the second hypothetical person would not be able to perform the claimant's past work. (R. 44).[2]

Finally, the ALJ presented Mr. Mosely with a third hypothetical worker who had the same limitations as the worker in the first hypothetical, but also had an additional allowance to miss three or more days of work each month. (R. 44-45). Mr. Mosley said the third hypothetical worker would not be able to perform any jobs in the national economy. (R. 45).

*The ALJ Decision*

The ALJ issued his decision on June 12, 2018 finding that the claimant was not disabled, and, therefore, not entitled to social security benefits under Title XVI. (R. 59). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the day the application was filed on March 9, 2016. (R. 64). Next, the ALJ identified the claimant's severe impairments as degenerative disc disease, gout, and diabetes with neuropathy. (R. 64).

Then the ALJ considered the claimant's medical history, noting that the claimant had several documented conditions that were categorized as nonsevere. (R. 64). The ALJ listed the claimant's nonsevere impairments as a history of diverticulosis, a history of deep vein thrombosis, hypertension, obesity, gastroesophageal reflux disease (GERD), and hyperlipidemia. (R. 64).

The ALJ addressed each of these nonsevere impairments to show why they did not reach the requirements of SSR 85-28. For the history of diverticulosis, the ALJ considered the notes in the record from the claimant's 2010 and 2016 colonoscopies, both of which revealed diverticulosis. The ALJ noted the colonoscopy revealed no abnormal findings. (R. 64). Concerning the claimant's history of deep vein thrombosis, the ALJ cited to the claimant's

---

[2] Mr. Mosley made no mention of jobs the claimant could perform at the sedentary level that exist in large numbers in the national economy.

statement in his medical records that he had stopped taking coumadin, the medication prescribed to him for the condition, after two years. (R. 64). The ALJ also noted no further clotting issues in the record. (R. 64).

The ALJ stated that the claimant's hypertension appeared to be "generally well-controlled with medications" and swelling was observed on an occasional basis and treated with a water pill. (R. 64-65). When considering the claimant's obesity, the ALJ looked to SSR 02-1P, but found that the claimant's ability to perform physical activities was not affected by his weight and the claimant was actually encouraged to exercise by his physicians. (R. 65). The ALJ noted the claimant's hyperlidemia and GERD, but said the record did not demonstrate that these conditions would prevent the claimant from performing basic work activities. (R. 65). Finally, the ALJ considered the claimant's complaint of a fracture in his left arm and arthritis in the same. He found the record lacked any evidence of treatment for these conditions and, therefore, they could not be "medically determinable impairments" as defined under 20 C.F.R. 416.908. (R. 65).

The ALJ determined that none of the claimant's impairments, nor a combination of his impairments, met the requirements of a listing in 20 C.F.R. part 404, subpt. P, app. 1. (R. 65). The ALJ specifically considered listing 1.04 (regarding the claimant's degenerative disc disease), listing 1.02 (regarding the claimant's gout), and listing 11.14 (regarding the claimant's diabetic neuropathy). (R. 65-66). In each case, the ALJ found the record could not support that the claimant met the listing requirements.

Next, the ALJ found the claimant had an RFC to perform light, unskilled work with several limitations. (R. 66). He stated the claimant's work must have "no climbing of ropes, ladders, or scaffolds; no work at unprotected heights or with hazardous machinery; occasional stooping, crouching, crawling, or kneeling; and frequent climbing of ramps or stairs." (R. 66).

The ALJ then explained that he applied the two-part standard for considering a claimant's pain and other symptoms, in which he must (1) determine if the claimant has "an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms, and (2) "evaluate the intensity, persistence and limiting effects" of the alleged symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. (R. 66). The ALJ stated that if objective medical evidence did not support the extent of limitations the claimant alleged, he must "consider other evidence in the record" to determine the claimant's limitations. (R. 66).

Although the ALJ stated earlier that he had taken "careful consideration of the entire record" in determining the claimant's RFC, he proceeded to walk through the claimant's testimony at the hearing and his treatment records, specifically noting when medical sources referred to the claimant's back and neck pain, gout, and diabetes with neuropathy (the claimant's severe impairments). (R. 66-68). He concluded his review of the record by finding that the claimant's impairments would be reasonably expected to cause some of the alleged symptoms, but "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical record and other evidence in the record." (R. 68). To support this assertion, the ALJ noted that the claimant reported relief from his medications; has maintained full strength and sensation; has a normal gait; has maintained control over his diabetes; has few gout flare ups; is not physically limited by his occasional swelling; and stated that he stays active, cares for his grandchild, and spends most of the day on his feet. (R. 68).

The ALJ then stated that the claimant has some limitations, and restated the work restrictions mentioned earlier. (R. 69). He assigned good weight to Dr. Ammar Aldaher's

opinion, finding that it was supported by Dr. Aldaher's own examination findings and consistent with the treatment records. (R. 69).

The ALJ then considered the claimant's past work as a cloth inspector and found the claimant would not be able to perform his past relevant work. (R. 69). The ALJ noted the claimant had changed age groups since applying for benefits, going from being a "younger individual" at forty-nine years old to "approaching advanced age" at fifty-two years old. (R. 69). He also stated the claimant had at least a high school education. (R. 69). Given the claimant's age, education, and work experience, the ALJ said "there are jobs in significant numbers in the national economy that the claimant can perform." (R. 69). The ALJ also noted the claimant would not qualify for benefits if the grids were used as a framework, because even if the claimant was able to perform of full range of light activity, the ALJ would still be directed by Grids 202.12 and 202.14 to find the claimant was "not disabled." (R. 69).

The ALJ acknowledged the claimant's limitations would impede his work abilities, and stated that he used the vocational expert's testimony to guide his determination of how much the claimant's limitations would hinder him in adjusting to other work. (R. 70). The ALJ noted the vocational expert's opinion that the claimant could work as a cashier, sales attendant, or cleaner/housekeeper and that these jobs existed in significant numbers in the national economy. (R. 70). The ALJ concluded that the vocational expert's testimony supported his final decision that the claimant was not disabled and could adjust to light work with limitations in the national economy. (R. 70).

## VI. DISCUSSION

*Substantial Evidence Supporting Claimant's RFC*

First, the claimant contends that the ALJ did not support his determination of the claimant's RFC with substantial evidence from the record as required by SSR 96-8p. This court disagrees.

This court's task is not to determine if the ALJ *could* have found differently, but to determine if the ALJ supported his actual decision with substantial evidence from the record. *See* 42 U.S.C. § 405(g). The ALJ has a duty to support his determination of the claimant's RFC with substantial evidence, and he meets his duty by linking his findings to specific evidence from the record concerning the claimant's remaining abilities despite his limitations. *See Colvin*, 557 F. App'x at 852; *Packer*, 542 F. App'x at 891-92.

In this case, the ALJ adequately supported his determination of the claimant's RFC with substantial evidence from the record. He considered the opinion evidence and all of the claimant's symptoms to the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence. In support of his determination, he discussed the record at length, citing to the claimant's medical sources. The ALJ concluded that the claimant could perform light, unskilled work with limitations. (R. 66). He supported his determination by noting that the claimant reported relief from medications; has maintained full strength and sensation; has maintained control over his diabetes; has a normal gait and is not physically limited by occasional swelling in his legs, ankles, and feet; has few gout flare ups; and the claimant stated he stays active, cares for his grandchild, and spends most of the day on his feet. (R. 68).

The ALJ stated that the claimant generally reports good relief with his prescribed medications despite his claims of disabling back and neck pain, as evidenced by his positive response to medications and denial of additional medications. (R. 68). The ALJ cited to a visit on

May 29, 2014, at which the claimant told NP White that a recent increase in his pain medications and muscle relaxers "worked very well" to help control his back pain. (R. 377). The ALJ also cited two instances of the claimant denying additional treatment: he told NP White in October 2014 that he would rather work on his diet and exercise than take more medication, and told PA Castellone in June 2016 that he did not want another prescription despite complaints of pain in his feet. (R. 380, 476).  Finally, the ALJ noted that on January 19, 2017, Dr. Towles-Moore said the claimant's medications and diabetic diet were "working" to treat his diabetes. (R. 510). Despite his claims of disabling pain, the claimant generally had good relief from his medications.

The ALJ next stated that the claimant "maintains full strength and full sensation," and is not disabled by a lack of muscular strength or numbness. (R. 65). In support, the ALJ cited to a December 3, 2013 appointment, at which Dr. Simons noted the claimant had normal muscle strength. (R. 67, 372). The ALJ also cited to an October 6, 2014, visit at which NP White performed a diabetic foot examination and found the claimant had full sensation in his feet. (R. 68, 381). The ALJ noted that on April 21, 2016, Dr. Aldaher found the claimant had normal reflexes, sensation that responded to pinpricks and vibrations, and no muscle weakness (R. 67, 463). The ALJ cited another diabetic foot examination in April 2017, at which time NP Sullivan found no weakness or loss of sensation. (R. 68, 521). Finally, the ALJ cited to visits in November 2017 and March 2018, at which Dr. Towles-Moore described the claimant's sensation as normal. (R. 68, 539, 549). Therefore, although the claimant has been diagnosed with diabetic neuropathy, he retains full muscular strength and sensation, and would not be prevented from doing basic work activities because of weakness.

The ALJ also cited substantial evidence from the record to support his conclusion that the claimant maintained control over his diabetes, and while the claimant has complained of

neuropathy at appointments, "the sensory findings have remained normal." (R. 66). The ALJ noted that while the claimant had occasional noncompliance issues, such as NP White's reports of the claimant eating a poor diet, checking his blood sugar sporadically, and not taking his metformin, the claimant's diabetes was generally well-controlled. (R. 68, 380, 383). The ALJ cited to visits with Dr. Simons, who prescribed the claimant glimepiride to better treat his diabetes and noted on August 24, 2015 that the claimant's diabetes was well-controlled. (R. 68, 388, 395). On eight separate visits to Calhoun Falls Family Practice between June 2010 and April 2013, the claimant himself described his diabetes as stable (R. 68, 334, 336, 339, 341, 343, 348, 357, 363). Finally, the ALJ noted that Dr. Towles-Moore stated the claimant's diabetes was stable on March 2, 2018. (R. 68, 543). While the claimant's diabetes likely contribute to his occasional swelling, his physicians state that his diabetes is well-controlled by medication and only seemed to interfere with his well-being when the claimant was noncompliant with his treatment.

The ALJ cited to several appointments as substantial evidence to support his conclusion that the claimant has a normal gait, and while his treating physicians occasionally note swelling in his legs and feet, the swelling does not restrict his ability to walk or stand. (R. 68). The ALJ noted that Dr. Wiggins described the claimant's gait as normal at a December 27, 2010 follow-up visit (R. 68, 339). On April 21, 2016, Dr. Aldaher also described the claimant's gait as normal, as did Dr. Towles Moore on April 20, 2017. (R. 65, 463, 517). Therefore, while the ALJ considered the claimant's alleged gait disturbance, the ALJ properly relied on the objective medical statements that the claimant had a normal gait that did not impede his ability to walk.

The ALJ stated that the record reveals "few complaints of gout with no objective evidence of any acute flares." (R. 68). He noted that on March 21, 2016, the claimant denied any

27

recent gout flare ups, and reported a history of gout but no current gout issues when he saw Dr. Aldaher on April 21, 2016. (R. 68, 480, 462). Dr. Aldaher also found that the claimant had normal grip strength. (R. 463). Finally, the ALJ noted the claimant's report of gout in his right hand and left elbow to Dr. Towles-Moore on September 12, 2016, but also noted that Dr. Towles-Moore "observed no related abnormalities" and refilled his prescription of allopurinol to prevent future attacks. (R. 68, 507). The claimant may have occasional gout attacks, but they are rare, treated with medication, and do not appear to have impeded his grip strength.

The ALJ found that the claimant stays active. He noted the claimant's own statements at a follow-up visit in December 2015 that he "is staying very active with his grandchildren" and "trying to lose weight." (R. 68, 396) The ALJ also pointed to Dr. Towles-Moore's report on January 19, 2017, that the claimant was "up on his feet a lot of the day" and his swelling mostly went down at night. (R. 68, 510). The ALJ included that, at the hearing, the claimant said he takes care of his three year old grandchild seven days a week, every other week. (R. 68, 32). Finally, the ALJ stated that the claimant's treating physicians encouraged him to exercise, and several times specifically encouraged him to go for walks. (R. 376, 479, 507, 515, 532, 540). The ALJ supported his determination that the claimant could perform light work, not just sedentary, by showing that the claimant did not lead a sedentary lifestyle and his treating physicians never stated that he should restrict his activity, instead repeatedly encouraging him to exercise.

The ALJ assigned good weight to Dr. Aldaher's opinion, finding it generally consistent with the record as a whole. (R. 69). He also properly relied on the vocational expert's testimony that the claimant was capable of light work and could adjust to work as a cashier, sales attendant, or housekeeper. (R. 69, 70). For the reasons stated above, this court finds that the ALJ supported

his decision on the claimant's RFC with substantial evidence from the record as required by SSR 96-8p.

*Medical Vocational Guidelines*

Second, the claimant argues that the ALJ should have applied the grids and determined the claimant was qualified for disability benefits under Grid 201.12. This court disagrees.

The ALJ should not rely exclusively on the grids in two instances. First, he should not rely exclusively on the grids if the claimant has non-exertional impairments or a mix or exertional and non-exertional impairments. 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2). Second, he should not rely exclusively on the grids if the claimant is not able to perform a full range of work at a given exertional level. *See Walker*, 826 F.2d at 1002.

In this case, the ALJ could not and did not rely exclusively on the grids because the claimant reported pain, which is a nonexertional limitation. The ALJ also could not rely exclusively on the grids because the claimant had several limitations and could not perform a full range of light work. Thus, the ALJ needed testimony from a vocational expert. While the ALJ could have used the grids as a framework to guide his decision, he recognized that he could not mechanically apply them to the claimant's unique situation, and properly relied on the testimony of a vocational expert. Therefore, the ALJ did not err in failing to apply Grid 201.12 to the claimant.

**VII. CONCLUSION**

For the reasons above, this court concludes that the decision of the commission should be AFFIRMED. The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED this 31st day of July, 2020.


**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE